Joe Brown LOWERY III, Appellant,

v.

The STATE of Texas, Appellee.

No. 05–95–01793–CR.

Court of Appeals of Texas,
Dallas.

Aug. 27, 1998.

Peter Lesser, Dallas, for appellant.

Lori L. Ordiway, Asst. Dist. Atty., Dallas, for state.

Before LAGARDE, OVARD and ROACH, JJ.

## OPINION

LAGARDE, Justice.

Joe Brown Lowery, III appeals his conviction for indecency with a child. After finding appellant guilty, the trial court sentenced appellant to five years' imprisonment. Appellant brings two points of error contending that: (1) the evidence is legally insufficient; and (2) appellant never waived his right to a jury trial. We overrule appellant's first point of error and sustain his second point of error. We reverse the trial court's judgment and remand the cause.

### SUFFICIENCY OF THE EVIDENCE

In his first point of error, appellant contends that the evidence is legally insufficient to support his conviction. When reviewing the legal sufficiency of the evidence, this Court must examine the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 318, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *Butler v. State*, 769 S.W.2d 234, 239 (Tex.Crim.App.1989), *overruled on other grounds by Geesa v. State*, 820 S.W.2d 154 (Tex.Crim.App.1991). In making this determination, the reviewing court considers all the evidence including improperly admitted evidence. *Rodriguez v. State*, 819 S.W.2d 871, 873 (Tex.Crim.App.1991). Questions concerning the credibility of witnesses and the weight to be given their testimony are to be resolved by the trier of fact. *Bonham v. State*, 680 S.W.2d 815, 819 (Tex.Crim. App.1984), *cert. denied*, 474 U.S. 865, 106 S.Ct. 184, 88 L.Ed.2d 153 (1985). The standard of review in a circumstantial evidence case is the same as in a direct evidence case. *Geesa*, 820 S.W.2d at 160–61.

The sufficiency of the evidence is measured by the elements of the offense as

defined by a hypothetically correct jury charge for the case. *Malik v. State*, 953 S.W.2d 234, 240 (Tex.Crim.App.1997). This hypothetical charge would set out the law, be authorized by the indictment, not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describe the particular offense for which the defendant was tried. *Id.* This standard applies to both jury and bench trials. *Id.*

The indictment alleged that on or about May 27, 1995, appellant intentionally engaged in sexual contact with B., a child younger than seventeen years, "by contact between the hand of the defendant and the vaginal area over complainant's clothing, with the intent to arouse and gratify the sexual desire of the defendant." *See* TEX. PENAL CODE ANN. § 21.11(a)(1) (Vernon 1994). B. testified that she was born on April 26, 1985.

B. testified about the offense as follows:

Q. [By the Prosecutor:] That night in May of 1995 was it the first part of May or the last part of May?

A. I think it was the last part of May.

Q. On or about May the 27th of 1995?

A. Yes.

Q. What did he [appellant] do?

A. He would rub all over me.

The Court: I beg your pardon, [B.]? What did you say?

The Witness: He would rub all over me.

Q. Where would he rub you?

A. All over my body.

Q. What did he rub you with?

A. His hand.

Q. Did he rub you over your clothes or under your clothes?

A. Over.

* * * *

Q. Okay. What did you do when Joe rubbed your ˄ private part with his hands?

A. I would get up and I would go to my room—my mother's room.

Q. Did you say anything to him?

A. Huh-uh—well, yeah.

Q. What did you say?

A. No.

Q. Did he stop when you said no?

A. No. Sometimes, yeah.

Q. Did he stop that time?

A. Yes.

Q. And where did go [sic] after he—after he stopped?

A. My mother's room.

* * * *

Q. [B.], was—when Joe touched you and rubbed your private parts in May of 1995, was that the first time he had done that?

A. Yeah. Yes.

Q. Okay. Had he ever touched you before that?

A. No.

Q. Okay. You told your mom that he touched you before, though, didn't you?

A. Yeah—I don't know. Yeah, I guess. Yes. No.

Q. Which is it, [B.]?

The Court: [B.], what is the truth? Did he do it once, or was it—according to your recollection, did he do it just the time that you've been talking about or were there other times?

The Witness: There were other times.

The Court: This man right here?

The Witness: Uh-huh.

* * * *

Q. [B.], those other times where were you when he would come and touch you?

A. In my room. And sometimes I was in the garage. I was getting—my mom told me to go out and get some ice.

Q. When you'd go into the garage, what would he do?

* * * *

A. Well, he would start rubbing all over me and I just got lose [sic] and got the ice and ran out.

B.'s mother testified that she saw appellant touch B.'s vaginal area:

Q. [By the Prosecutor:] Would you please tell the Judge what you saw?

A. The first time, it was about three years ago. I really don't remember for sure. He was in the garage, and I went outside to tell [B.] to come and eat. He was—when I caught them or when I walked in, he had [B.] kind of standing in front of him, and he was rubbing on her vagina.

Q. What did you do when you saw that ... ?

A. I told him to let her go so she could go eat. He did let her go, and she went in the house.

Q. What did you do about that ... ? Did you call the police, or did your family take care of that problem?

A. At that time I didn't say anything yet because we had company over, so I waited.

Q. But what subsequently did you do?

A. The second time—whenever I caught him the second time, then I told my husband.

Q. What did you see the second time you caught him?

A. We was in—we were sitting in the living room watching TV, he come in, [B.] and I was both sitting on the love seat. He walked in, picked [B.] up, and sat [B.] in his lap. I was watching TV, and I decided to turn around and tell [B.] to go to her room. Well, he was—had her in his lap, he was holding her, and he was rubbing on her vagina. I made him let go of her. It was either that night or the next day I told my husband.

* * * *

Q. Did you see anything else?

A. One other time I did catch him. He come over—he said he wanted to lay down and go back to sleep for a little while. I told him okay, and he had— as far as I knew, he had laid down on the couch. So I went back and laid down a little bit and I got back up.

He was in [B.]'s room, sitting on the side of her bed. From what I seen it looked like him rubbing on her vagina again.

* * * *

Q. [By Defense Counsel:] ... You said with regard to the third incident, "from what I seen, it looked like he was rubbing on her vagina." Now what exactly does that mean?

A. Wasn't exactly sure if he was or not.

Q. Okay. Were you sure the other two times?

A. Yes, I did see the other two times.

■ Appellant asserts that the evidence is insufficient because the record does not show that appellant touched B.'s vaginal area. Appellant argues that B.'s testimony that appellant "would rub all over me" and rub "all over my body" is insufficient to prove that appellant touched her vaginal area.

Assuming, without deciding, that appellant is correct that B.'s testimony alone fails to establish the charged offense, we must consider whether B's testimony, combined with her mother's testimony, established the charged offense. B. testified that appellant would rub her with his hands over her clothes, and her mother testified that she saw appellant rubbing B.'s vagina. The indictment alleged that the offense occurred "on or about May 27, 1995."

■ The State is not bound by the specific date on or about which the offense is alleged to have been committed. The State can rely upon an offense committed on a date other than the one specifically alleged as long as the date is anterior to the presentment of the indictment and within the statutory limitations period and the offense relied upon otherwise meets the description of the offense contained in the indictment. *See* TEX.CODE CRIM. PROC. ANN. art. 21.02(6) (Vernon 1989); *Yzaguirre v. State,* 957 S.W.2d 38, 39 (Tex. Crim.App.1997); *Sledge v. State,* 953 S.W.2d 253, 255–56 (Tex.Crim.App.1997); *Evans v. State,* 769 S.W.2d 319, 320 (Tex.App.—Dallas 1989, no pet.).

At the time the indictment was filed on October 6, 1995, the statute of limitations for indecency with a child by sexual contact was ten years. *See* Act of May 30, 1987, 70th Leg., R.S., ch. 176, § 1, 1987 Tex. Gen. Laws 2591, 2591, *amended by* Act of May 24, 1997, 75th Leg., R.S., ch. 741, § 1, 1997 Tex. Gen. Laws 2403, 2403 (codified at TEX.CODE CRIM. PROC. ANN. art. 12.01(5)(A) (Vernon Supp. 1998) (limitations period changed to "ten years from the 18th birthday of the victim of the offense")). The State had to prove the offense occurred during the ten years preceding October 6, 1995.

■ B.'s mother testified she twice saw appellant rubbing B.'s vagina within about three years of the trial, which occurred on November 2, 1995. Appellant was in custody from June 20, 1995 until the trial. Therefore, the offense testified to by B.'s mother had to have occurred prior to June 20, 1995, which was before the presentment of the indictment on October 6, 1995.[1] B. testified that appellant would rub her with his hands over her clothes. B.'s and her mother's testimony establishes that appellant committed the charged offense prior to and within ten years of the presentment of the indictment and is sufficient to support appellant's conviction. We overrule appellant's first point of error.

### DEPRIVATION OF RIGHT TO TRIAL BY JURY

In his second point of error, appellant contends that he never "waived his right to trial by jury as required by article 1.13 of the Texas Code of Criminal Procedure." *See* TEX.CODE CRIM. PROC. ANN. art. 1.13 (Vernon Supp.1998). On appellant's motion, we abated the case to permit the trial court to conduct a hearing "to determine whether appellant executed a written jury waiver in open court before appellant's trial." After the hearing, the trial court entered written findings of fact that:

(1) appellant was tried without a jury;

(2) neither appellant, his counsel, nor the State executed a written jury waiver in open court;

(3) appellant was not orally asked to waive his right to a jury trial; and

(4) no entry on the docket sheet indicated that any admonishments were given concerning a waiver of a jury.

The trial court concluded its findings by stating, "THEREFORE, IT IS THE FINDING OF THIS COURT, that appellant did not execute a written jury waiver in open court before appellant's trial in the above-numbered cause on November 2, 1995."

■ The right to a jury trial at the guilt stage is both a statutory right and a constitutional right.[2] *See* U.S. CONST. art. III, § 2 & amend. VI; TEX. CONST. art. I, § 15; TEX.CODE CRIM. PROC. ANN. art. 1.12 (Vernon 1977). That right cannot be relinquished except by an express waiver. *See* TEX.CODE CRIM. PROC. ANN. art. 1.13 (Vernon Supp. 1998); *Meek v. State*, 851 S.W.2d 868, 870 (Tex.Crim.App.1993); *Marin v. State*, 851 S.W.2d 275, 278–79 (Tex.Crim.App.1993), *overruled on other grounds by Cain v. State*, 947 S.W.2d 262, 264 (Tex.Crim.App.1997).

■ The State does not assert that appellant abandoned his right to a jury trial by not objecting in the trial court to the lack of a jury. *Cf. Meek*, 851 S.W.2d at 870 (the appellant's motion to remand the cause to trial court to determine whether jury trial was expressly waived overcame presumption of regularity created by statement in judgment that the appellant expressly waived a jury trial); *Marin*, 851 S.W.2d at 278–79 (stating in dicta that right to jury trial cannot be

---

1. This indictment was a "reindictment." However, the complaint was filed in this case on June 21, 1995, when appellant was in custody. Although the record does not show the date of the original indictment, nothing indicates it was filed before June 20, 1995. Appellant never raised the issue of limitations during trial or on appeal. It is the defendant's burden to raise the issue of limitations before the State has a burden of proving that the offense is not barred by limitations.

*See Proctor v. State*, 967 S.W.2d 840, 844 (Tex. Crim.App.1998).

2. The right to trial by jury at punishment is a statutory right but is not a constitutional right. *See* TEX.CODE CRIM. PROC. ANN. art. 37.07, § 2(b) (Vernon Supp.1998); *Allen v. State*, 552 S.W.2d 843, 847 (Tex.Crim.App.1977); *Sterry v. State*, 959 S.W.2d 249, 257 (Tex.App.—Dallas 1997, no pet.).

relinquished absent an express waiver). To the extent any preservation of error was necessary, appellant preserved the trial court's error of depriving him of a jury trial at the guilt stage of the trial by moving this Court to remand the cause under former rule of appellate procedure 55 for the trial court to determine whether appellant filed a written jury waiver. *See Meek*, 851 S.W.2d at 870; *see also* TEX.R.APP. P. 55 (former rules); TEX.R.APP. P. 34.5 (current rules).

■ We conclude that the trial court erred in denying appellant a jury trial. Because the error in this case was a constitutional error, we must determine whether the error is subject to harmless error review and, if so, whether beyond a reasonable doubt the error contributed to the conviction or punishment. *See* TEX.R.APP. P. 44.2(a). If the error is not subject to a harmless error review or if we cannot determine beyond a reasonable doubt that the error did not contribute to the conviction or punishment, then we must reverse appellant's conviction. *See id.*

The State argues that appellant was not harmed by the lack of a jury trial because the record supports the trial court's finding of guilt and because rational jurors could have found appellant guilty beyond a reasonable doubt. Appellant argues that no harm analysis is necessary, relying on *Meek*. In *Meek*, the court of criminal appeals relied on its analysis in *Marin* that certain types of error are not subject to a harmless error analysis. *See Meek*, 851 S.W.2d at 870–71; *Marin*, 851 S.W.2d at 281–82. In *Marin*, the court of criminal appeals ruled that the harmless error rule should be limited "to those trial errors concerning which the record is likely to provide 'concrete data from which an appellate court can meaningfully gauge or quantify the effect of the error.'" *Marin*, 851 S.W.2d at 282. The court refused to apply the harmless error analysis "to any error the ultimate consequence of which defies empirical examination on the basis of a typical appellate record alone." *Id.* In *Meek*, the court of criminal appeals determined that the violation of the defendant's right to a jury trial fell into this latter

category and, without conducting a harm analysis, remanded for a new trial. *See Meek*, 851 S.W.2d at 871.

In *Cain*, the court of criminal appeals re-examined its holding in *Marin* that certain errors were not subject to a harm analysis. The court concluded that all errors, except structural constitutional errors,[3] were subject to a harm analysis. *See Cain*, 947 S.W.2d at 264. The court overruled *Marin* and all other cases that conflicted with it. *See id.* The court stated that "where the error involved defies analysis by harmless error standards ..., then the error will not be proven harmless beyond a reasonable doubt under Rule 81(b)(2)." *Id.; see* TEX.R.APP. P. 81(b)(2) (former rules); *see also* TEX.R.APP. P. 44.2(a) (harmless error rule for constitutional errors under current rules of appellate procedure). *Cain*, therefore, declared that (except for structural constitutional errors) all errors, which under *Marin*'s analysis were not subject to a harm analysis, would be subject to a harm analysis and, if they defy analysis by harmless error standards, would be harmful. *See Cain*, 947 S.W.2d at 264; *Marin*, 851 S.W.2d at 282; *see also* TEX.R.APP. P. 44.2(a) (constitutional error results in reversal unless reviewing court finds error harmless beyond a reasonable doubt).

After *Marin* was overruled by *Cain*, the vitality of *Meek*'s holding that the deprivation of the right to a jury trial is reversible without a harm analysis is questionable. Under *Cain*, we must determine whether the error is a structural constitutional error. If so, then the error is reversible without a harm analysis. *See Cain*, 947 S.W.2d at 264. However, if the error is not a structural constitutional error, then we must conduct a harmless error analysis. If the error defies analysis by harmless error standards, or if the error may have contributed to the conviction or punishment, then we must reverse. *See id.;* TEX.R.APP. P. 44.2(a).

In *Sullivan v. Louisiana*, 508 U.S. 275, 113 S.Ct. 2078, 124 L.Ed.2d 182 (1993), the Supreme Court held that the submission of an unconstitutional definition of "reasonable

---

**3.** The court in *Cain* limited this type of error to "certain federal constitutional errors labeled by the United States Supreme Court as 'structural.'" *Cain*, 947 S.W.2d at 264.

doubt" was structural constitutional error. *See id.* at 281–82, 113 S.Ct. 2078. In determining whether a harmless error analysis could be applied, the Court considered the effect of the error as depriving the defendant of a jury verdict, which is the error in this case. Thus, although the actual error in *Sullivan* (submission of an unconstitutional definition of reasonable doubt) was different from the error in this case (violation of the right to a jury trial), we consider *Sullivan* to be controlling because the effect of the error in *Sullivan* is the same as the actual error in this case.

In *Sullivan,* the Supreme Court considered whether a harmless error analysis could be applied to the deprivation of a jury verdict and determined that it could not. The Court stated that harmless error analysis examines "the basis on which 'the jury *actually rested* its verdict.'" *Id.* at 279, 113 S.Ct. 2078 (quoting *Yates v. Evatt,* 500 U.S. 391, 404, 111 S.Ct. 1884, 114 L.Ed.2d 432 (1991)) (emphasis added in *Sullivan* ). Harmless error review cannot be used "to hypothesize a guilty verdict that was in fact never rendered—no matter how inescapable the findings to support that verdict might be." *Id.* "There being no jury verdict of guilty-beyond-a-reasonable-doubt, the question whether the *same* verdict of guilty-beyond-a-reasonable-doubt would have been rendered absent the constitutional error is utterly meaningless." *Id.* When there is no jury verdict, a reviewing court can only engage in speculation of what a reasonable jury would have done. *See id.* at 281, 113 S.Ct. 2078. "[W]hen it does that, 'the wrong entity judge[s] the defendant guilty.'" *Id.* (quoting *Rose v. Clark,* 478 U.S. 570, 578, 106 S.Ct. 3101, 92 L.Ed.2d 460 (1986)). Thus, deprivation of the right to a jury trial is not subject to harmless error review. *See id.*

The Court then determined whether the denial of a jury verdict of guilt beyond a reasonable doubt was a constitutional structural defect. The Court determined that it was such a defect because the right to a jury trial is a basic protection "whose precise effects are unmeasurable, but without which a criminal trial cannot reliably serve its function." *Id.* at 281, 113 S.Ct. 2078. The Court

stated that "[t]he deprivation of th[e] right [to a jury trial], with consequences that are necessarily unquantifiable and indeterminate, unquestionably qualifies as 'structural error.'" *Id.* at 281–82, 113 S.Ct. 2078.

Applying *Sullivan* to the facts of this case, we conclude that the denial of appellant's right to a jury trial was a constitutional structural error not subject to a harm analysis. Accordingly, we conclude that the error was harmful. *See* Tex.R.App. P. 44.2(a); *Cain,* 947 S.W.2d at 264. We sustain appellant's second point of error.

We reverse the trial court's judgment and remand the cause for further proceedings.